LAW OFFICES OF
## JEFFREY LICHTMAN
11 EAST 44TH STREET
SUITE 501
NEW YORK, NEW YORK 10017
www.jeffreylichtman.com

JEFFREY LICHTMAN
JEFFREY EINHORN
DAVID GELFAND

PH: (212) 581-1001
FX: (212) 581-4999

March 28, 2022

**BY ECF**
Hon. Sidney H. Stein
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re: <u>United States v. Philbrick, et al.</u>, 20 CR 351 (SDNY) (SHS)

Dear Judge Stein:

### A.     INTRODUCTION

      This letter is submitted on behalf of defendant Inigo Philbrick in advance of his April 8, 2022 sentencing. With this letter, the defendant respectfully requests a sentence which is "sufficient, but not greater than necessary to comply with the purposes" set forth in 18 U.S.C. § 3553(a)(2) due, in part, to the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The basis for this request is as follows: *first*, Mr. Philbrick immediately accepted responsibility for his criminal conduct, agreed to meet with law enforcement following his arrest, and provided detailed information concerning his and other frauds in the art market over a number of debriefings; *second*, while the defendant's restitution obligation is still being calculated by the government, the actual harm suffered by the victims in this case is likely far less than the loss amount utilized for determining the defendant's sentencing guidelines; *third*, the defendant has experienced extraordinarily harsh conditions at the Metropolitan Detention Center ("MDC"), where he has remained incarcerated for nearly the entire pandemic; and *fourth*, a review of the defendant's life finds that there are many good deeds and the prospects for his rehabilitation are very good.

### B.     THE DEFENDANT'S GUILTY PLEA<br>         AND RESULTING GUIDELINES RANGE

      On November 18, 2021, Mr. Philbrick pleaded guilty pursuant to a plea agreement to Count One of a two-count Indictment, which charged him with Wire Fraud, in violation of 18

JEFFREY LICHTMAN

Hon. Sidney H. Stein
United States District Judge
March 28, 2022
Page 2

U.S.C. § 1343 (Count One). See October 29, 2021 Plea Agreement ("Plea Agreement") at p. 1. Mr. Philbrick faces no mandatory minimum and a maximum sentence of 20 years imprisonment. Id.

As recounted in the Presentence Investigation Report ("PSR"), the base offense level for Count One is 7. U.S.S.G. § 2B1.1(a)(1); PSR at ¶ 54. Twenty-four levels are then added pursuant to §2B1.1(b)(1)(M) for a loss greater than $65M, but less than $150M ($86,672,790), two levels are added for sophisticated means and because a substantial amount of the scheme was committed from outside of the United States (§2B1.1(b)(10)(C)), and two levels are added because the offense involved 10 or more victims (§2B1.1(b)(2)(A)(i)), resulting in an adjusted offense level of 35. PSR at ¶¶ 55-57, 61. With three levels subtracted for acceptance of responsibility (§3E.1.1), the total offense level is 32, carrying an advisory sentencing range in the Criminal History Category I of 121-151 months imprisonment. PSR at ¶ 116.

### C. THE DEFENDANT'S BACKGROUND AND THE NATURE OF THE OFFENSE – APPLICATION OF § 3553(a) FACTORS

Since the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005), the Sentencing Guidelines have been rendered advisory in nature, leaving sentences to the district court's discretion, guided by the Guidelines and the other factors contained within 18 U.S.C. § 3553(a) and bounded by any applicable statutory minimum and maximum. This Section directs sentencing courts to "impose a sentence" that is "sufficient, but not greater than necessary, to comply with" the "need for the sentence ... to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; [and] to protect the public from further crimes of the defendant ...." 18 U.S.C. §3553(a)(1)-(2) (emphasis supplied). In making this determination, courts are to consider "the nature and circumstances of the offense and the history and characteristics of the defendant ...." 18 U.S.C. § 3553(a)(1). Accordingly, we offer the following for the Court's consideration.

#### i. The Defendant's Attempted Cooperation with the Government

Mr. Philbrick's efforts to cooperate with law enforcement began almost immediately upon his arrival in the Southern District of New York, with the defendant quickly accepting responsibility for his own criminal conduct and providing details concerning the other persons involved in his frauds. As we anticipate will be discussed in the government's sentencing submission, his efforts to assist law enforcement involved participating in approximately six lengthy proffer sessions during the height of the pandemic in the fall of 2020. See Probation's Sentencing Recommendation and Justification, PSR at p. 29. Notably, each in-person proffer session with the government also required that Mr. Philbrick quarantine upon returning to the

JEFFREY LICHTMAN

Hon. Sidney H. Stein
United States District Judge
March 28, 2022
Page 3

MDC for weeks thereafter. Indeed, it was during one of these periods of quarantine and with no access to a telephone or email that his fiancé, Victoria, gave birth to their daughter, G.[1] This was a knowing decision on the part of the defendant – in scheduling this proffer session, Mr. Philbrick knew that his daughter's birth was imminent and that it would be unlikely that he would be near a telephone during the mandatory period of quarantine that followed. Nevertheless, his desire to cooperate with law enforcement was very strong.

As observed in the PSR, "[d]uring the proffer sessions, Philbrick was forthcoming about his conduct. He provided information regarding the criminal conduct of others who participated in some of the fraudulent transactions with him ...." Id. "The defendant also provided information regarding various questionable practices in the art market." Id. In addition to participating in these proffer sessions, defense counsel participated in multiple attorney proffers – answering follow-up questions posed by the government on the defendant's behalf when a formal proffer with Mr. Philbrick could not be scheduled or would be impractical. Further, Mr. Philbrick provided the government with a copy of his computer hard drive which had not been seized upon his arrest and was left in Vanuatu, and "consented to a search of his iCloud account." Id.

Although the information that the defendant provided did not lead to "additional criminal investigations or prosecutions," (id.) and therefore did not rise to the level warranting a cooperation agreement or §5K1.1 letter, he nevertheless provided important information to the government and has agreed to make himself available for additional proffer sessions or testimony if needed. Id. The defendant's efforts to cooperate and the information that he provided, however, should be considered by the Court pursuant to 18 U.S.C. § 3553(a) in fashioning an appropriate sentence in this case. United States v. Olaiya, 446 F. App'x 388, 389 (2d Cir. 2011) ("Under section 3553(a)(1), district courts should consider 'the contention that a defendant made efforts to cooperate, even if those efforts did not yield a Government motion for a downward departure pursuant to U.S.S.G. § 5K1.1.'") quoting United States v. Fernandez, 443 F.3d 19, 33 (2d Cir. 2006).

    ii.    **The Loss Amount Overstates the Actual Harm to the Victims in this Case**

As observed in the PSR, Mr. Philbrick's fraud involved some 29 works of art and transactions valued at $86.43M. PSR at ¶ 11. The defendant in some instances sold more than 100% of an artwork to "multiple individuals and entities without their knowledge," and in others,

---

[1] As required by Rule 21.3 of the SDNY Electronic Case Filing Rules and Instructions, the names of Mr. Philbrick's two minor children have been replaced with their first initials. See SDNY Electronic Case Filing Rules & Instructions, February 1, 2021 Edition.

JEFFREY LICHTMAN

Hon. Sidney H. Stein
United States District Judge
March 28, 2022
Page 4

sold works of art or used them as collateral "without the[] knowledge [of their owners]." PSR at ¶ 10. Philbrick also admitted that he utilized false documents to inflate his claimed purchase price of certain works before selling percentages to co-investors. See, e.g., PSR at ¶ 16. While deplorable conduct, it is notable that not all of the $86.43M involved in these transactions evaporated upon the fraud being uncovered – instead, the location and ownership of many of the works of art at issue are known, and indeed, there is pending litigation in both the United States and abroad resolving complicated questions of ownership. See, e.g., Athena Art Finance Corp. v. That Certain Artwork By Jean-Michel Basquiat Entitled Humidity, 1982, In Rem, 20 CV 04669 (GBD) (SDNY). Put another way, while the amount of restitution owed by the defendant is still being calculated by the government, it is likely that this figure will be less than the loss utilized for his sentencing guidelines.

For example, regarding the fraud involving Basquiat's "Humidity," Philbrick claimed to an investor, Sasha Pesko, that he had purchased the work for $18.4M and not (truthfully) $12.5M, before selling a 50% stake to Pesko based on his inflated purchase price for $9.2M and also receiving a $3M loan from him. Id. Philbrick then sold another 12.5% stake in the work to a third individual, Damien Delahunty, for $2.75M, claiming that he had actually purchased the work for the even greater inflated price of $22M, lying that he and Delahunty would together own 25% of the work, with an undisclosed third party holding the remaining 75% interest. PSR at ¶ 17. Thereafter, this work and others were utilized as collateral by Philbrick, without disclosing other ownership interests, to receive a $13.5M loan from Athena Art Finance Corp. PSR at ¶ 14. For guidelines loss calculation purposes, the government estimated that Philbrick's fraud with regard to Humidity amounted to $28.45M: $9.2M and $3M from the initial 50% stake and loan by Pesko, $2.75M for the 12.5% stake by Delahunty, and $13.5M for the loan from Athena. The actual harm to these three parties – even after accounting for legal fees for the litigation resolving ownership interests – is likely far less as the work remains valued north of $12.5M. Therefore, the $28.45M loss for guidelines purposes will likely be far greater than the financial harm suffered by the victims.

Similarly, the actual harm to victims with regard to the fraud involving the portrait of Picasso by Rudolph Stingel is less than the loss for guidelines purposes. As it pertains to that work, the defendant accepted or agreed to accept more than $15 million (PSR at ¶ 29), the result of payments or agreements to accept future payments with three partners: $7.1M from Fine Art Partners ("FAP"), $3.35M from Pesko through Satfinance, and a $6M loan from Guzzini Properties, Ltd. Of the $7.1M promised by FAP, only $2.485M was paid to the defendant, with the balance deferred and to be remitted only at the time the work was sold to a third party. The $6M loan by Guzzini included two other works of art held as collateral and resulted in hundreds of thousands of dollars in interest being paid by Philbrick to the entity. And the Guzzini loan was eventually paid down by some $2M resulting in one of the works, a piece by Christopher Wool, being released. When this information was provided to Probation and the government by

the defendant, the government replied that while the "total loss it attributed [to that work] ... was approximately $12.58M ... <u>the total amount of restitution owed will be likely less than that</u>." Addendum to the PSR at p. 1 (emphasis supplied).

In providing these examples, our purpose is not to retreat from Mr. Philbrick's sincere acceptance of responsibility for his crimes. Instead, we seek only to provide additional insight into the actual financial harms suffered by the victims in this case and note that it will likely be less than the loss amount for the purposes of calculating the defendant's sentencing guidelines. <u>See</u> <u>United States v. Certified Environmental Services</u>, 753 F.3d 72, 102 (2d Cir. 2014) ("Though restitution and loss involve closely related calculations, which ultimately produce the same figure in many cases, the inquiries are not identical. Restitution serves a compensatory function, and focuses on the victim and the harm proximately caused by the defendants conduct") (internal citation and quotation marks omitted).

### iii. The Defendant's Harsh Conditions of Confinement During the COVID-19 Pandemic

There has been perhaps no more difficult time to be an incarcerated defendant in the United States than during the past two years. The defendant was arrested abroad on June 12, 2020 and promptly brought to the Southern District of New York to face prosecution. He has spent nearly this entire period at the MDC, which has rendered communications with both defense counsel and his family extraordinarily difficult. For a majority of his period of incarceration, contact visits with his family were either prohibited outright or rendered nearly impossible. And despite the near constant quarantines and lockdowns at the MDC, Mr. Philbrick was still infected with COVID-19 twice while incarcerated at the facility. <u>See, e.g.</u>, <u>United States v. Elder and Bryant</u>, No. 18 CR 92 (WFK), 2022 WL 836923, at *8 (SDNY March 21, 2022) ("The unsanitary conditions and the rapid spread of COVID-19 at the [MDC] in Brooklyn, for example, have been well-documented ....").

The conditions only worsened at the MDC when the Metropolitan Correctional Center in Manhattan ("MCC") was closed and the bulk of its inmates were transferred to Brooklyn, causing overcrowding. <u>See</u> <u>United States v. Boyd</u>, 21 CR 486 (SHS), 2022 WL 790771, at *2 (SDNY February 3, 2022) ("The MDC, long overcrowded, has recently had an influx of additional detainees due to the closure of the Metropolitan Correctional Center (MCC) and the transfer of the majority of its inmates to the MDC"). In a communication with counsel in February of this year, Mr. Philbrick relayed that apparent staffing issues and supply shortages had

JEFFREY LICHTMAN

Hon. Sidney H. Stein
United States District Judge
March 28, 2022
Page 6

made conditions even worse, especially when combined with a national lockdown inside federal prisons after a gang altercation in Texas in January.[2]

The effects on the defendant of these harsh conditions have not been just psychological: Mr. Philbrick indicated to counsel at one point that his left leg had an oozing rash due to his inability to access clean clothes and showers every two to four days. Requests for medical assistance to examine the infection on his leg went unanswered. Mr. Philbrick also relayed that at the time he and other inmates had been fed only lunch meat and peanut butter sandwiches for weeks, without access to a single vegetable or hot meal. Further, during this most recent lockdown in January (one of many), the defendant was permitted out of his cell for just ten to thirty minutes, three times per week.

Courts in both the Southern and Eastern and Districts of New York have taken note of the deplorable conditions at the MDC. For example, Judge Garaufis in March 2022 denounced the conditions of pretrial confinement at the facility as "unreasonably and unusually harsh." United States v. Elias, No. 18 CR 33, 2022 WL 805334, at *6 (EDNY March 16, 2022); see also United States v. Rolle, 20 CR 564 (AJN), 2022 WL 605712, at *1 (SDNY March 1, 2022) (observing that the Court considered the "conditions at MDC" in imposing a below guidelines sentence). As "the severity of the conditions of confinement is a not unreasonable basis for a court to impose a shorter sentence than might otherwise be warranted," we respectfully request that it form the basis for a variance from the defendant's sentencing guidelines in this case. United States v. Zhong, 26 F.4th 536, 564 (2d Cir. 2022).

    iv.    **The History and Characteristics of the Defendant**

We have attached several character letters in support of this submission, reflecting the significant and meaningful role that Mr. Philbrick has played in the lives of friends, family members and recipients of his good deeds and charity. It would be impossible to include a letter from every individual whom Mr. Philbrick has positively influenced, still, the myriad letters attached to this submission and on which we remark paint a consistent picture of an "extremely generous person," (January 26, 2022 Letter of Karen Adams, attached as Exhibit A) who is "kind" and "caring," (Letter of Andrea Previ, attached as Exhibit B) "good-willed," (January 27, 2022 Letter of Robert Bulkeley, attached as Exhibit C) and "attentive, thoughtful and respectful to everyone ...." Letter of Eleanor Baker-Harber, attached as Exhibit D; see also February 11, 2022 Letter of Anna Baker-Harber, attached as Exhibit E ("he looks for the good in everybody").

---

[2] See Michael Balsamo and Michael Sisak, U.S. Federal Prisons on Lockdown After 2 Texas Inmates Killed, Associated Press, January 31, 2022, available at: https://www.usnews.com/news/politics/articles/2022-01-31/us-federal-prisons-on-lockdown-after-2-texas-inmates-killed (last viewed March 24, 2022).

JEFFREY LICHTMAN

Hon. Sidney H. Stein
United States District Judge
March 28, 2022
Page 7

Finally, several of the letters note Inigo's "remorse" for his criminal conduct (Ltr. of Andrea Previ, Ex. B) and express the "shock[]" they experienced in initially learning of the allegations in this case. December 15, 2021 Letter of Philippe Levy, attached as Exhibit F; see also Ltr. of Anna Baker-Harber, Ex. E ("I know he deeply regrets the decisions he made in the past that have led him to where he is now"); PSR at ¶ 86 (Jane Philbrick: "deeply regrets his conduct") (internal quotation marks omitted). Sadly, were it not for this sentencing, many of Mr. Philbrick's exceptionally good deeds probably would have gone unrecognized.

     Mr. Philbrick's Drug and Alcohol Abuse

Before turning to the letters praising his good character, a review of the defendant's history of substance abuse is warranted. As observed in the PSR, Mr. Philbrick has a lengthy history involving both alcohol and drug use that began when he was in high school. PSR at ¶ 93. Starting at "the age of 15 until the age of 17 or 18," he "smoked marijuana daily," and his use of the substance continued into 2019. Id. at ¶ 94. In addition to the marijuana, Mr. Philbrick "experimented with Ritalin, Adderall and Oxycodone during his high school years." Id. at ¶ 93. With regard to alcohol, the defendant advised Probation that he had his first drink at the age of 16 and "began drinking alcohol on a daily basis when he was 18 or 19 years old." Id. at ¶ 95.

Thereafter, the defendant's use of drugs and alcohol intensified as he entered London's art world, which he acknowledged was a "hard drinking industry," and one in which he had a "reputation for hard drinking." PSR at ¶ 95. Specifically, "he would begin drinking alcohol at lunch and continued to do so throughout the day, often using illegal drugs as well," adding that it was "how art deals are done," in addition to using the substances to "manage stress." Id. (internal quotation marks omitted). Mr. Philbrick "continued to drink alcohol to intoxication on a daily basis" until approximately 2019, when he ceased work as an art dealer. Id. With regard to the aforementioned narcotics, the defendant began using cocaine when he was 22 years old and "did so in connection with his work in the art field." Id. at ¶ 96. He also used MDMA/ecstasy "a couple of times per month," and Ketamine "once a month beginning when he was 22 or 23 years old," also in relation to his job as an art dealer. Id. at ¶¶ 97-98.

The letters submitted in support of the defendant and appended hereto corroborate the accounts of his use of drugs and alcohol during the time of the offense. For example, Anna Baker-Harber notes in her letter that given the number of people dependant on him in his professional capacity, she was "not surprised to see that he was drinking quite heavily," further adding: "rumor had it that he was also self medicating." Ltr. of Anna Baker-Harber, Ex. E. Friend and mentee Ferdinand Gros confirms: "He had some alcohol and then drug addiction problems that were increasing closer to his case being revealed," noting that he believed it was a "wrongful way of coping with the stress ..." Letter of Ferdinand Gros, attached as Exhibit G.

**JEFFREY LICHTMAN**

Hon. Sidney H. Stein
United States District Judge
March 28, 2022
Page 8

<u>The Defendant's Childhood and Family Struggles</u>

As recounted in the PSR, Mr. Philbrick was born in England and moved to the United States with his parents when they returned from working abroad when he was three or four years old. PSR at ¶¶ 73, 76. His parents relocated to Manhattan, where he experienced a "bohemian" upbringing in the West Village. PSR at ¶ 76. Both of his parents were involved in the arts – his father painted and his mother sculpted – and when the defendant was 10 years old, his father took on the position as director of education at the Aldrich Contemporary Art Museum in Ridgefield, Connecticut. <u>Id.</u> at ¶ 77. The family moved out of Manhattan and the defendant's father eventually went on to serve as the director of the museum. <u>Id.</u> Sadly, it was around this time that Mr. Philbrick's father "became less involved in family life," and "checked out," also becoming "intoxicated nightly ...." <u>Id.</u> at ¶ 78.

When he was 17, the defendant discovered that his father was engaging in an affair with his secretary – leading to the separation and divorce of his parents. <u>Id.</u> at ¶ 79. Worse, his father had utilized the proceeds from the sale of the family home to "fund gifts to, and travel with this other woman." <u>Id.</u> The divorce "devastated" the defendant's mother, and for a time she and her two children lived in a neighbor's garage. <u>Id.</u> Further, "at the request of his mother," the defendant cut off communication with his father, and he began to feel pressured to provide financially for both his mother and sister. <u>Id.</u>

Jane Philbrick, the defendant's mother, confirmed this account in her interview by Probation, relaying that she "cannot convey how strong Inigo was for [her and his sister], and that "much fell on his shoulders" during this time. PSR at ¶ 86. In her letter to the Court, she supplied a fuller account of the struggles that they endured:

> The first months after his father left were distraught and uncertain. On par with the emotional blow was the discovery that my ex-husband had spent all of the proceeds of the sale of our house, our only financial nest egg.
>
> ***
>
> Inigo was eighteen years old when his father left. My ex-husband had no legal responsibility to our son financially, including college tuition and support. My divorce lawyer put it bluntly: Inigo would be educated in the "school of hard knocks." When his father later reneged on our divorce settlement to pay our daughter's tuition and support, Inigo stepped in and paid up, protecting his sister from a similar blow.

\*\*\*

> At every step of this sometimes harrowing, stubbornly fragile, yet sincerely purposeful and urgent journey, Inigo has been a steadfast support and champion, never doubting my ability to persevere through adversity to create lasting value, beauty, and grace.

January 3, 2022 Letter of Jane Philbrick, attached as Exhibit H.

 Victoria Baker-Harber, the defendant's fiancé and mother of one of his daughters, confirms this account, informing the Court that he had "taken a lot on from a young age and felt an obligation to look after his mother." Letter of Victoria Baker-Harber, attached as Exhibit I ("He has looked after his mother since the divorce, working multiple jobs at a time from the age of 17, as well as helping put his sister through college"). In her letter to the Court, the defendant's sister, Clara, recalls that her mother "very clearly told 19-year-old Inigo that he was financially responsible for both her and me." February 14, 2022 Letter of Clara Philbrick, attached as Exhibit J. And Nadia Philips echoes that "he had a lot on his plate from a young age, but he seemed wholly accepting of it." Letter of Nadia Phillips, attached as Exhibit K; see also Ltr. of Philippe Levy, Ex. F ("it was of fundamental importance for him to ... help his mother ....").

 The defendant's father, Harry Philbrick, confirms in his letter to the Court that he and Inigo had a "very close" relationship prior to the divorce, which resulted in an "acrimonious and toxic situation" for the defendant and his sister. January 12, 2022 Letter of Harry Philbrick, attached as Exhibit L. Harry Philbrick's take on his divorce, however, differs greatly than that of his ex-wife – and the differing views perhaps explain the difficulty encountered by the defendant and his sister in navigating their relationships with their parents as children. For example, Harry Philbrick recalls:

> Both [Inigo and his sister], at the instigation of their mother, were estranged from me for many years. Clara suffered what she calls traumatic emotional damage during this period, and I have been supporting her financially and emotionally over the last five years as she regains stability in her life. Inigo and I were completely out of touch from roughly 2011 until late 2021.
>
> <u>At 19 Inigo was told, falsely, by his mother, that I had left her and Clara homeless and unsupported, and that he was solely responsible for providing for them. Inigo was given completely inappropriate emotional and financial responsibilities. It is clear to me that Inigo went through his own traumatic emotional damage</u>

> and was unable to discern that he was on an inappropriate path. When, in 2016, Clara suggested to him that he not continue to financially support his mother and forge his own path he pulled away from Clara as well.

Id. (emphasis supplied).

Clara Philbrick provides additional insight into the fallout from their parent's divorce, noting that their mother lied to them about not receiving "spousal support" from their father and that she was "physically and emotionally abusive as well as erratic and removed from reality." Ltr. of Clara Philbrick, Ex. J. Worse, Clara adds in her letter that their mother's "threatening her own life, in order to control me, was normal." Id. (emphasis supplied). Effectively without a parent during this time, Clara describes in her letter the tremendous support and assistance that she received from her brother:

> My mother had completely cut off my father's access to parenting me but was not parenting me herself. Inigo, at 19, stepped in. He bought me a winter coat when I no longer had one that fit. He bought me acne face wash when I hit puberty. Inigo paid for half of my first two years of college (tuition, room, food). Inigo was the person who emotionally and physically defended and stepped between me and my mother on my behalf. Inigo was my only lifeline in childhood.

Id. (emphasis supplied).

### A Committed Family Man

As noted above, Inigo was a steadfast source of financial and emotional support for his mother and sister after the divorce of his parents. PSR at ¶ 77. It should come as no surprise to learn, therefore, that his desire to aid family members has carried through to his daughters, fiancé, and others in his extended family.

To begin, Victoria Baker-Harber, the defendant's fiancé and mother of his youngest child, G., who was born after the defendant's arrest, informs the Court in her letter:

> Inigo and I began as friends ... in [the] summer of 2016 and we often confided in each other – on the surface he always appeared to be happy and confident but the reality was not entirely the case. ... At the time of our friendship changing in late 2017, his primary concern was for his daughter, O[.] and looking after and providing

JEFFREY LICHTMAN

Hon. Sidney H. Stein
United States District Judge
March 28, 2022
Page 11

> for his ex-girlfriend, Fran. His priority was to be the best father he could be, despite a less then ideal setup. He would often fly back to London from Miami even just for a day to be able to see O[.] for a few hours. I think this desire to be all things to all people probably stemmed from his mostly absent father and the disappointments during his own childhood and early adulthood. I realized he had taken a lot on from a young age and felt an obligation to look after his mother. Inigo always tried to do the right thing and never wanted to disappoint anyone. I realize how our parents' relationships in ways, shape our views in life but the after effects can be damning. ... I would often see Inigo sending video messages to Fran for O[.] and it broke his heart to be so far away from her while we were on the other side of the world.

Ltr. of Victoria Baker-Harber, Ex. I. Regarding their daughter, G., Victoria adds the following concerning Mr. Philbrick's attempts to remain present in her life despite his incarceration:

> Inigo always tries to schedule his calls around her bedtime so he can read her a story – usually one of his favorites he remembers from his own childhood where his mother would read avidly to him. I know it at least brings him some comfort to be part of our routine and to be able to hear her, even just be on speaker while I'm doing bath or dinner time.

Id.; see also Letter of Rory Japp, attached as Exhibit M ("We all long for the day when Inigo, Victoria, and G[.] can be united").

Friend Andrea Previ confirms Victoria's take, writing in his letter:

> I observed him to be an extremely generous, kind, and wise person. I felt his personal approach was one of someone who avoided confrontation at all costs and underneath the facade, was quite insecure. Despite this, he was always available to support and help anyone in need, and came from the heart. As a very close family friend, from both Victoria's parents, they loved that he brought out the best in their daughter. They were very beautiful together. It's been torturous to watch her journey alone since his absence. Her strength has been outstanding since Gaia was born but I've witnessed some very tragic moments of loss and despair. <u>I can only salute Inigo's attempts to be as present as possible as both a father and a partner.</u> I can't imagine what he has had to endure

> with covid limitations and a family on the other side of the Atlantic. The pain to have not been able to meet his daughter is heartbreaking.

Ltr. of Andrea Previ, Ex. B (emphasis supplied).

Eleanor Baker-Harber hails that Inigo brought out "the best side of [her] sister," Victoria, adding from her own experience:

> I always felt at ease in his company. Having suffered from (at times debilitating) social situational anxiety since I was a teenager, Inigo was always the one to spot me on the sidelines looking awkward or uncomfortable, never hesitating to (discreetly) come to my rescue and always happy to include the underdog.
>
> At the time, I was only just beginning to find my feet in the music industry and often lacked confidence and belief in myself. From day one, Inigo often went out of his way to encourage me and advance my music career; introducing me or putting me in touch with anyone he thought was relevant or could give me a boost – no matter how far-fetched.

Ltr. of Eleanor Baker-Harber, Ex. D. Eleanor's brother, Sam, had a similar experience with the defendant selflessly offering to help in his time of need, recalling for the Court:

> [A] friend of mine tragically passed away at a young age. Inigo immediately and without hesitation reached out to me to offer his condolences, telling me he had lost a friend around the same age and that he was there if I wanted a fresh pair of ears.

Letter of Sam Baker-Harber, attached as Exhibit N; see also Ltr. of Anna Baker-Harber, Ex. E ("always very thoughtful and kind and happy to sort out my technical or computer related problems").

### A Dedicated and Reliable Friend

It is not just his family members who sing Mr. Philbrick's praises – the submitted letters also include anecdotes from friends and mentees who were also recipients of his good nature. For example, Nadia Phillips hails that "he has always been a person [she] felt [she] could rely on," adding:

> He always took an interest in people and wanted to know where they came from and what their story was.
>
> I lost my brother a few years ago from an overdose. It is something that has affected me profoundly. I have also grown up with a difficult family dynamic. Inigo was one of the very few people I could openly talk to about things as we had a lot of mutual experiences. <u>He never judged or questioned, but listened and understood</u>.

Ltr. of Nadia Philips, Ex. K (emphasis supplied). Friend Rory Japp similarly lauds:

> Inigo was kind, humble, and understated. ... I was always struck by Inigo's curiosity and genuine interest in other people's opinions and experiences. He would always show great interest in what was going on in my life, and always offering his thoughts, advice as well as introducing me to a number of influential people who have helped me in my own career. <u>I owe a lot to Inigo's generosity and forthcomingness</u>.

Ltr. of Rory Japp, Ex. M (emphasis supplied); <u>see also</u> Letter of William Noble, attached as Exhibit O ("brilliant soundboard ... and I would often turn to Inigo for his opinion on work related matters. ... Inigo always provided clear, educated assessments of what he thought I ought to do ....").

In his letter to the Court, former mentee Ferdinand Gross recalls the guidance and advice that he received from Mr. Philbrick, which he followed in opening his own art gallery:

> I met Mr. Philbrick while on holiday[] in Spain the summer of 2017. His face was familiar, I recognized him from the New York art scene and [e]specially in auction houses. Then I was an art history student completing my internship at Christie's Auction House, New York. We got along very quickly, and he was extremely kind and generous to me. I come from a family of art collectors, so we had a lot to share on that topic. I never felt like he was interested in me for my family or business opportunities. I feel like he saw in me a younger self. I was in my early 20's then and he was in his early thirties. Mr. Philbrick invited me often to diners and parties, he was often with his, then friend and business partner, Kenny Schachter. Following his footsteps, he would introduce me to some of his clients. When we were in the same

JEFFREY LICHTMAN

Hon. Sidney H. Stein
United States District Judge
March 28, 2022
Page 14

> town, he would often include me in his social plans. When we were alone, he would give me advice into how to run a gallery, treat clients. He is extremely well educated and mannered, and I saw him at the time as a role model. We shared the same interests business wise, in arts and had the same philosophy when it came to having fun. <u>However, it was difficult to conduct business with him, when I presented some opportunities, he was always a little shady and keeping me away. Which often got me confused as on the one hand he wanted me around but on the other kept me out of the business side. As soon as his crimes came to light, I understood he was trying to protect me by keeping me out. He could have taken advantage of me in a million ways but did not</u>.

Ltr. of Ferdinand Gross, Ex. G (emphasis supplied).

Finally, Karen Adams, who lived on the island of Vanuatu at the same time as the defendant, provides the Court with an account of when Inigo came to her aid:

> Our beloved friend and employee['s] ... wife committed suicide ... she was 25 and left 2 daughters aged 4 and 6. I was absolutely heart broken and hysterical, I was unable to function normally for quite a few weeks, <u>Inigo came to visit me regularly bringing us food and small gifts along with words of comfort</u>. Vanuatu custom dictates the funeral is held over 2 days and involves many rituals, it is usual for men and women to grieve separately so my husband had to attend alone which he found quite daunting[.] [W]ithout hesitation Inigo insisted he accompany and support my husband throughout these tragic few days, he also assembled 2 huge baskets of food and toys and teddy bears that he and Victoria took to Michael's daughters, S[] and A[]. <u>We can never repay Inigo for the compassion and kindness he showed us during this awful time</u>
> ....

Ltr. of Karen Adams, Ex. A (emphasis supplied).

<u>Commitment to Charity and Community Service</u>

In addition to his being a dedicated friend, the submitted letters also hail Mr. Philbrick's desire to help those in need, including other inmates at the MDC. <u>E.g.</u>, Ltr. of Jane Philbrick, Ex. H ("letter writing" assistance "to fellow inmates").

JEFFREY LICHTMAN

Hon. Sidney H. Stein
United States District Judge
March 28, 2022
Page 15

      For example, former inmate Okechukwu Peter Ezika recalls the defendant's assistance to him and others during their time together at the MDC in his letter to the Court, noting that "on several occasions [he] watched Inigo de-escalate situations that could have been volatile [and] also watched [him] help other inmates in [their] unit with legal letters and teaching them to write correctly ...." December 15, 2021 Letter of Okechukwu Peter Ezika, attached as Exhibit P; Ltr. of Anna Baker-Harber, Ex. E (Inigo has "helped many other inmates ... write letters for their defense who have no other way of getting their story across"); Ltr. of Victoria Baker-Harber, Ex. I ("helping [inmates] who don't have the reading and writing skills he has – helping them articulate their stories to their lawyers and really taking the time to listen ....").

      While in Vanuatu with the defendant, Karen Adams recalls a particularly difficult time when he volunteered to help those he barely even knew:

> In April of 2020 Inigo and Victoria moved to Mele Village, an expat friend of ours had tragically passed away and his wife and 4 young children were forced to leave Vanuatu and return to the UK leaving their small boat house vacant. Jude Leske, a friend and real estate agent was desperately looking for someone to house sit and on hearing this <u>Inigo immediately offered to help, despite the house being in a poor state of repair, he and Victoria moved in and spent time and expense ensuring the property was well cleaned and well cared for</u>. During their time in Mele Village, Inigo became very good friends with the native villagers (Ni-Vanuatu People). He would give them gifts of food and clothes and offer them money in return for small jobs as the area has a very low employment rate, Inigo soon became ingratiated into Mele Village and was well loved and respected, he was honored enough to be given the nickname man mele. It may be hard to understand but the local population are very mistrusting of visitors and rarely allow us into their customs and village, so Inigo was extremely touched at their kindness and acceptance.

Ltr. of Karen Adams, Ex. A (emphasis supplied); Ltr. of Victoria Baker-Harber, Ex. I (Recalling "Inigo's kindness to outsiders, whether it be picking up locals from the village in Vanuatu to get them to a funeral, taking in stray dogs and newly born pups after a typhoon, and even wanting to get to a neighboring island to help rebuild a village after total destruction from the typhoon"); <u>see also</u> Letter of Gilbert & George, attached as Exhibit Q ("decent young person").

JEFFREY LICHTMAN

Hon. Sidney H. Stein
United States District Judge
March 28, 2022
Page 16

### v. Recent SDNY Prosecutions Involving Fraud in the Art Market Support a Variance from the Guidelines

Finally, two recent high-profile prosecutions in the Southern District of New York involving art fraud support our request that Mr. Philbrick receive lenient sentence in this case. See 18 U.S.C. § 3553(a)(6); Freeman v. United States, 131 S. Ct. 2685, 2694 (2011) (Sentencing Reform Act "aims to create a comprehensive sentencing scheme in which those who commit crimes of similar severity under similar conditions receive similar sentences").

First, in February 2017, Glafira Rosales was sentenced by Judge Failla to time served – amounting to just three months imprisonment – for selling 60 "previously unknown works by artists including Robert Motherwell, Willem de Kooning and Jackson Pollock," that were all later determined to be valueless fakes. See Colin Moynihan, Dealer in Art Fraud Scheme Avoids Prison, New York Times, January 31, 2017, available at: https://www.nytimes.com/2017/01/31/arts/design/dealer-in-art-fraud-scheme-avoids-prison.html (last viewed March 24, 2022). While Rosales received a cooperation agreement from the government, her sentencing guidelines were higher than Philbrick's at 151 to 181 months imprisonment and her scheme spanned some 15 years as opposed to Philbrick's four years. See United States v. Rosales, 13 CR 518 (KPF), Govt's January 24, 2017 5K1.1 Ltr., ECF. No. 48 ("long-running, multi-million dollar fraud scheme in which the defendant and her co-conspirators sold fake works of art to unsuspecting customers and laundered the proceeds of these illicit sales"). According to the government, the victim purchasers of Rosales' fake works of art suffered some $81M in losses, similar to the loss in this case, however, unlike Philbrick, Rosales also laundered her illicit proceeds and committed tax fraud. Id. As with Philbrick, Rosales attended six proffer sessions with the government and never testified on their behalf. Id. Instead, Rosales' three co-conspirators, whom she helped indict, all fled the country and have avoided prosecution. See id. Taking all of this into account, Rosales received a sentence 148 months below the bottom of her guidelines range.

Second, in September 2018, Ezra Chowaiki was sentenced by Judge Rakoff to 18 months imprisonment – a significant variance from his sentencing guidelines of 51 to 63 months imprisonment – for using his eponymous art gallery to commit fraud. See United States v. Chowaiki, 18 CR 323 (JSR), Govt's September 19, 2018 Sentencing Memorandum, ECF No. 73. Specifically, Chowaiki "gave away works that had been consigned to [him] to third parties in exchange for money or the satisfaction of debts," and in other cases "solicited investments from dealers to buy artwork through or in partnership with the [g]allery and then kept that money without following through on the transactions." Id. In all, the government indicated that Chowaiki's fraud resulted in an approximate $10M loss and involved "dozens of works of art." Without a cooperation agreement, Chowaiki received a sentence that was a mere fraction of his guidelines range.

JEFFREY LICHTMAN

Hon. Sidney H. Stein
United States District Judge
March 28, 2022
Page 17

### D. CONCLUSION

Defendant Inigo Philbrick comes before this Court asking for mercy. A life filled with good deeds and hard work has been marred by his criminal actions. Nevertheless, as the powerful enclosed letters reveal, Mr. Philbrick is a decent and giving young man who unlike many defendants has made efforts to help friends, family and even strangers throughout his life, when no one was watching, when he had no need to impress a judge deciding his fate. For these reasons and the others stated herein, a lenient sentence is respectfully requested.

Respectfully submitted,

Jeffrey Lichtman
Jeffrey Einhorn

Encs.

cc: Jessica Feinstein, Esq.
Cecilia Vogel, Esq.
Assistant United States Attorneys (by ECF)