UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

UNITED STATES OF AMERICA                  :

   *-v.-*                                            :          20 Cr. 351 (SHS)

INIGO PHILBRICK,                          :

                Defendant.        :

-----------------------------------------------------------------x


## THE GOVERNMENT'S SENTENCING MEMORANDUM


DAMIAN WILLIAMS
United States Attorney
Southern District of New York


Jessica Feinstein
Cecilia Vogel
Assistant United States Attorneys
- Of Counsel -

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................. 1

BACKGROUND .................................................................................................................... 2

    A.  THE DEFENDANT'S FRAUD SCHEME ......................................................................... 2

        1.  *Philbrick's Loan Contract with Athena Art Finance* ...................................... 4

        2.  *Jean-Michel Basquiat's "Humidity"* ........................................................... 4

        3.  *Christopher Wool's "Untitled" (2010)* ....................................................... 6

        4.  *Fraud on Jay Jopling* .................................................................................. 7

        5.  *Rudolf Stingel's "Untitled" (2012) (Picasso)* ............................................. 8

        6.  *Donald Judd's "Untitled" (2018)* .............................................................. 11

        7.  *Yayoi Kusama's "Infinity Nets"* ................................................................. 12

    B.  THE DEFENDANT'S SCHEME UNRAVELS AND HE BECOMES A FUGITIVE ................. 13

    C.  THE DEFENDANT'S ATTEMPTED COOPERATION WITH THE GOVERNMENT .............. 14

    D.  THE GUIDELINES CALCULATION AND PROBATION'S RECOMMENDATION ............. 15

    E.  Forfeiture and Restitution ............................................................................ 16

DISCUSSION ...................................................................................................................... 17

    I.  A SUBSTANTIAL TERM OF IMPRISONMENT IS WARRANTED ................................... 17

        1.  *The Nature and Seriousness of the Offense and the Need for Just Punishment Call for a Significant Prison Term* ......................................................... 17

        2.  *The Defendant's Disdain for Victims and Lack of Remorse Warrant a Significant Term of Imprisonment* .......................................................................... 20

        3.  *The Sentence Imposed Should Reflect the Need for General Deterrence of Fraud in the Art Market* ........................................................................................ 22

CONCLUSION ..................................................................................................................... 25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

UNITED STATES OF AMERICA                    :

   -*v.*-                                              :      20 Cr. 351 (SHS)

INIGO PHILBRICK,                            :

                Defendant.               :

--------------------------------------------------------------x

## THE GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Inigo Philbrick is scheduled to be sentenced on May 5, 2022, at 10:0 a.m.  The Government respectfully submits this memorandum in connection with that sentencing and in response to the defendant's sentencing memorandum (Dkt. No. 57) ("Def. Mem.").

## PRELIMINARY STATEMENT

The defendant is responsible for one of the most significant frauds in the art market in history.  He capitalized on his reputation as a talented young art dealer to convince investors and lenders into trusting him with their art and money.  In fact, lies permeated nearly every aspect of the defendant's business, which ultimately grew into a Ponzi-like scheme premised on fractional art investments and fraudulently obtain loans.  The defendant spent his victims' funds on acquiring art to lure more investors, on paying off other clients, and on his own expensive lifestyle.  At times, the defendant fabricated documents, including with forged signatures of innocent third parties, to induce his victims to pay him.  Over a four-year period, the defendant engaged in over $86 million in fraudulent art deals that resulted in millions in losses to victims. While the Government is seeking forfeiture and restitution from the defendant, in reality, many of the victims may never recover their lost assets.

When the defendant's scheme finally began to unravel in October 2019, the defendant fled to a remote island in the Pacific rather than face the consequences of his actions. Only after his arrest and imprisonment in the instant case did the defendant finally decide to accept responsibility. He sought to reduce his sentencing exposure by meeting with the Government on multiple occasions and describing his own criminal conduct as well as the conduct of others in the art market. While the defendant deserves due credit for a fulsome acceptance of responsibility and proffers with the Government, the extensive harm he caused over the course of years demands a significant punishment. Therefore, for the reasons that follow, the Government seeks a sentence that is below the Sentencing Guidelines range of 121 to 151 months' imprisonment, but that nevertheless amounts to a significant term of imprisonment, substantially greater than the twenty-two months Philbrick has already served.

## BACKGROUND

### A.    The Defendant's Fraud Scheme

The defendant was an art dealer specializing in post-war and contemporary visual art. His eponymous business Inigo Philbrick, Ltd. ("IPL") had galleries in London and Miami. While some of the defendant's clients were collectors seeking to purchase art for their possession and enjoyment, his business increasingly became the sale of artworks or percentage ownership of artworks as financial investments, with the idea that the defendant would help the investors resell the artworks shortly after purchase. Often, the physical artworks would remain in the defendant's storage facilities even after sale to investors so that the defendant could have access to the artworks as he tried to resell them for a profit.

As set forth in the Presentence Investigation Report (the "PSR"), from 2016 through 2019, the defendant, along with his business partner Robert Newland, engaged in an extensive scheme to defraud art collectors, investors, and lenders in the art market (the "Fraud Scheme").

2

(PSR ¶ 10).  As part of the Fraud Scheme, the defendant made material misrepresentations and omissions regarding the ownership and provenance of artworks in order to access valuable art and obtain sales proceeds, funding, and loans.  (*Id.*).  The defendant also furnished fraudulent contracts to artificially inflate the value of certain artworks and to conceal his scheme, including a contract that listed a stolen identity as the seller, and a consignment agreement that forged the signature of an auction house employee.  Newland, who acted primarily as the defendant's financial advisor, facilitated several of the defendant's fraudulent transactions, including by strategizing with the defendant and making material misrepresentations to victim investors and lenders.[1]  (*Id.*).

Through its investigation, the Government has identified 29 artworks that the defendant used to conduct fraudulent art deals in furtherance of the Fraud Scheme.  (PSR ¶ 11).  In total, the defendant caused $86.43 million in fraudulently obtained transactions and losses to victims. (*Id.*).  The $86.43 million represents payments that victims sent to the defendant based on his fraudulent misrepresentations.[2]  The defendant used the proceeds of the Fraud Scheme to fund his business and a lavish lifestyle.  In addition to using the fraud proceeds to pay off investors and lenders and purchase new artwork to further the Fraud Scheme, the defendant also paid for expensive vacations, hotels, restaurants, wine, watches, and furniture using his crime proceeds. (*Id.*).  This spending, in turn, furthered the Fraud Scheme by cloaking the defendant in the

---

[1] On February 25, 2022, a Superseding Indictment charging Newland with conspiracy to commit wire fraud and substantive wire fraud for his involvement in the Fraud Scheme was unsealed. The Government is seeking Newland's extradition from the United Kingdom.

[2] The $86.43 million does not reflect losses premised on estimations or appraisals of the market value of artworks, and it does not reflect contractual or pre-judgment interest owed to victims or legal fees paid by victims due to the Fraud Scheme.

trappings of success, such that wealthy investors and art collectors trusted him with their money and art.

The following are examples of fraudulent transactions that the defendant perpetrated as part of the Fraud Scheme.

### 1.  *Philbrick's Loan Contract with Athena Art Finance*

Starting in approximately 2016, the defendant began to obtain loans from Athena Art Finance Corp. ("Athena"), a company based in Manhattan, New York that specializes in providing loans secured by art pledged as collateral.  (PSR ¶ 14).  On March 31, 2017, the defendant, operating through a shell company incorporated in the Bailiwick of Jersey, entered into a loan and security agreement with Athena (the "Loan Contract") for a $10 million revolving loan secured by a rotating pool of artworks approved by Athena (the "Collateral Pool").  The loan amount was later increased to $13.5 million.  (PSR ¶ 14).  In order to obtain financing for his business, the defendant defrauded Athena by misrepresenting his ownership interest in various artworks in the Collateral Pool.  As further described below, the defendant pledged artworks as collateral which he had already sold portions of to third parties, and then made false representations to Athena that he (through the shell company) was the sole owner of those artworks.  (PSR ¶ 14).

### 2.  *Jean-Michel Basquiat's "Humidity"*

The defendant defrauded Athena and two investors in connection with a 1982 painting by Jean-Michel Basquiat titled "Humidity" (the "Basquiat").  In summary, the defendant induced art investor Alexander Pesko ("Pesko") and gallerist Damian Delahunty ("Delahunty") to make substantial payments for the Basquiat based on fraudulent contracts and misrepresentations regarding the Basquiat's ownership.  Subsequently, the defendant pledged the Basquiat as part of

4

the Athena Collateral Pool, in the process lying to Athena that the defendant had clear title to the Basquiat.  (PSR ¶¶ 15, 16).

First, in August 2016, the defendant entered into an agreement with Pesko, who was acting on behalf of Satfinance Investment Ltd. ("Satfinance"), to jointly purchase the Basquiat. During negotiations with Pesko, the defendant provided Pesko with a fraudulent contract purporting to show that the defendant had agreed to purchase the Basquiat from SKH Management Corp. ("SKH") for $18.4 million.  The contract for the sale of the Basquiat was purportedly signed by an officer of SKH.  In fact, the contract was false.  Neither SKH nor the signing officer had previously owned the Basquiat, which had actually been purchased by the defendant in a private sale through an auction house for $12.5 million.  (PSR ¶ 16).  Pesko paid the defendant 50 percent of the purported $18.4 million purchase price of the Basquiat and also provided a $3 million loan to IPL secured by the Basquiat.

Next, in November 2016, the defendant sold a 12.5 percent ownership stake in the Basquiat to Delahunty for a total of $2.75 million.  The defendant falsely told Delahunty that the defendant was purchasing the Basquiat from SKH for $22 million, and he provided Delahunty with an unsigned contract purporting to show the sale from SKH to the defendant.  The defendant did not tell Delahunty about Satfinance's ownership interest in the Basquiat, and likewise did not disclose to Pesko the sale to Delahunty.  (PSR ¶ 17).

In March 2017, after the defendant had sold percentage ownerships of the Basquiat to Satfinance and Delahunty (and encumbered it with a $3 million loan), the defendant sought to pledge the Basquiat to the Collateral Pool.  In the process, the defendant falsely represented to Athena that he was the sole owner of the Basquiat and did not disclose the interests of Satfinance or Delahunty.  On April 7, 2017, Athena approved adding the Basquiat to the Collateral Pool,

and provided the defendant with an additional $3.25 million in financing as a result.  (PSR ¶ 18).
Pursuant to the Loan Contract, the defendant provided Athena with physical possession of the
Basquiat.

Athena, Satfinance, and Delahunty are currently locked in litigation over ownership of
the Basquiat.

3. *Christopher Wool's "Untitled" (2010)*

The defendant made material misrepresentations and omissions to investors and Athena
about the ownership of an untitled 2010 painting by Christopher Wool (the "Wool").  (PSR
¶ 19).

On June 25, 2018, the defendant contracted with Fine Art Partners ("FAP"), a German
company, to purchase the Wool on behalf of FAP for $6.9 million and then sell the Wool on
FAP's behalf.  On July 11, 2018, the defendant sold three ownership shares in the Wool, totaling
80 percent ownership of the Wool, to three other investors (The Gammon Collection Inc., David
Brooks Irrevocable Trust, and Andre Sakhai) for $1.2 million each.  The defendant did not
disclose his sale of those ownership shares to FAP, and he did not disclose FAP's ownership
interest to Sakhai or the other two investors.  The ownership interests of the four investors
totaled more than 100 percent ownership of the artwork.  (PSR ¶ 20).

In September 2018, the defendant then sought to add the Wool to the Collateral Pool.  In
the process, he represented to Athena over the course of several communications that the
defendant was the sole owner of the Wool.  The defendant did not disclose to Athena the
ownership interests of FAP, Sakhai, or the other two investors.  In October 2018, Athena
approved the Wool as an addition to the Collateral Pool and provided the defendant with an
additional $1.75 million in financing.  (PSR ¶ 21).

4. *Fraud on Jay Jopling*

The defendant defrauded his mentor in the art business, Jay Jopling, who operates White Cube Gallery ("White Cube"), a prominent art gallery based in London. The defendant began his career as an art dealer working for Jopling at White Cube, and eventually the defendant and Jopling participated in various joint ventures. (PSR ¶ 22). As detailed below, the defendant invented a fictitious art buyer to delay paying a debt owed to Jopling.

In 2015, the defendant and Jopling's joint venture, Philbrick Ltd. (a different entity than IPL), purchased an untitled 2009 painting by artist Christopher Wool, referred to as "P604," for $3.5 million. Jopling provided the financial backing for Philbrick Ltd. The defendant sold two-thirds of P604 to investors. In December 2016, the defendant told Jopling that he had sold Philbrick Ltd.'s remaining one-third interest in P604, along with 50 percent of a painting by artist Wade Guyton (owned by Jopling's entity Modern Collections), to an undisclosed purchaser (the "Client") for approximately $3.5 million. (PSR ¶ 23). The defendant did not provide Jopling with the proceeds from the sale.

In August 2017, Jopling had become frustrated that the defendant had failed to sell their jointly owned artworks and, in particular, had failed to repay him for the sale of P604 and the Guyton (together, "P604/Guyton"). The defendant falsely told Jopling that the Client had a legal issue that was delaying the payment, but Jopling began demanding that the defendant disclose the identity of the Client. (PSR ¶ 24).

Facing pressure from Jopling to disclose the Client and make payment, in 2017, the defendant invented a fake name and fake email account for the Client. The defendant told Jopling that the Client was the "Argentine financier Martin Herrero," a purported relative of the defendant's then-girlfriend Francisca Mancini ("Mancini"). The defendant provided Jopling

with a bill of sale reflecting that P604/Guyton were sold to Fine Artworks, Ltd. ("FAW") for $4.5 million, presenting it as Herrero's company.  In fact, Martin Herrero is a fictional person, and FAW was an entity controlled by the defendant, whose ultimate beneficial owner was Mancini.  Over the course of a year, the defendant (with Newland's help and assistance) used the email account "martinherrero1810@gmail.com" to send emails to Jopling pretending to be Herrero and providing Jopling with a variety of excuses as to why payment to Jopling was delayed.  (PSR ¶ 25).

While stringing Jopling along with the fictitious Herrero, the defendant sold P604 to other investors.  In June 2017, the defendant sold P604 to Guzzini Properties Ltd. ("Guzzini").  At some point, the defendant bought back P604 for $2 million.  In April 2018, the defendant sold 25 percent of P604 to Pesko on behalf of Satfinance for $3 million.  The defendant falsely represented to Pesko that the defendant and Satfinance were the only owners of P604.  In March 2019, the defendant gave Pesko physical custody of P604.  (PSR ¶ 25).

The defendant never fully repaid Jopling for P604/Guyton, ultimately owing him approximately $1.95 million.  (PSR ¶ 27).

   *5.  Rudolf Stingel's "Untitled" (2012) (Picasso)*

Between January 2016 and June 2017, the defendant sold shares of an untitled 2012 painting by the artist Rudolf Stingel depicting Pablo Picasso (the "Stingel Picasso") totaling more than 100 percent ownership to Pesko (on behalf of Satfinance), FAP, and Guzzini.  Pesko, FAP, and Guzzini paid or agreed to pay the defendant more than $15 million total for the Stingel Picasso, and they were each unaware of each other's respective claims.  (PSR ¶ 28).

In January 2016, the defendant sold Pesko a 50 percent share of the Stingel Picasso for $3.35 million.  On February 29, 2016, the defendant signed a contract with FAP to purchase the

Stingel Picasso on behalf of FAP for $7.1 million, with a target re-sale price of $9 million. FAP paid the defendant $2.485 million, representing 35 percent of the purchase price, and agreed to pay the remaining 65 percent after re-sale of the Stingel Picasso. As part of the agreement, FAP obtained title to the artwork. According to owners of FAP, the defendant provided FAP a written letter purportedly from the owner of the other 50 percent of the Stingel Picasso consenting to FAP's investment, although the name of the owner was redacted. Pesko, however, was not informed about this transaction with FAP and did not consent to it. The defendant did not inform Pesko of FAP's ownership interest. And although FAP knew that there was another partner on the Stingel Picasso, FAP was unaware of who that was. (PSR ¶¶ 30, 31).

On June 28, 2017, Guzzini entered into an agreement with IPL to purchase the Stingel Picasso together with two other artworks for $6 million total. Guzzini paid the defendant $6 million in June 2017. The defendant represented to Guzzini, falsely, that he had full legal and beneficial title to the artworks. The agreement was structured as a buy-back agreement: the defendant had the option to buy back the artworks by a certain date for $6.59 million. h (PSR ¶ 32).

In 2019, the defendant deceived FAP, Pesko, and Guzzini regarding the auction of the Stingel Picasso at Christie's Auction House ("Christie's"). The defendant negotiated to consign the Stingel Picasso with Christie's for sale at the May 2019 auction. Guzzini, which had physical possession of the Stingel Picasso, was the actual consigner for the auction. (PSR ¶ 35). Facing pressure from FAP to turn a profit on the Stingel Picasso, the defendant falsely informed FAP that Christie's had entered into a consignment agreement with the defendant on behalf of FAP, with a guaranteed minimum sales price of $9 million. The defendant later gave FAP a

copy of Christie's purported consignment agreement signed by a Christie's representative, but the consignment agreement was fake, and the signature was forged.  (PSR ¶ 33).

Separately, in 2018 and 2019, the defendant began asking Pesko to sell the Stingel Picasso.  Pesko wanted to hold onto the Stingel Picasso for his long-term collection, and he had offered to buy what he believed was the defendant's 50 percent share.  The defendant rejected Pesko's offer, telling Pesko that he believed the Stingel Picasso could sell for more.  Because they could not agree on a price, Pesko agreed that the defendant would consign the Stingel Picasso on Pesko's behalf at Christie's May 2019 auction.  Pesko authorized the defendant to then bid up to $6.5 million on Pesko's behalf at the auction.  If the Stingel Picasso sold for $6.5 million or less, Pesko would effectively buy the defendant's share, but if it sold for more, they would divide the profit.  (PSR ¶ 34).

The defendant asked gallerist Stellan Holm to bid on the Stingel Picasso during the May 2019 auction on behalf of an unnamed client of the defendant's (Pesko).  Stellan Holm made the winning bid on the Stingel Picasso.  However, the hammer price fell far short of the defendant's expectations, at only $5.5 million.  (PSR ¶ 35).  Because the auction did not go as well as the defendant had hoped, he was unable to repay or buy out the investors in the Stingel Picasso, and the Fraud Scheme began to fall apart.

The defendant invoiced Pesko for $3.35 million—half the final auction price including the buyer's premium—so that Pesko could purchase the defendant's half of the Stingel Picasso, as agreed.  Pesko paid the defendant, who then wired partial payment owed to Christie's (through Stellan Holm).  However, Christie's never received the remaining $4.5 million of the $6.5 million total payment for the Stingel Picasso.  Guzzini, the consigner, received $1 million from Christie's in connection with the sale, but never received the outstanding money owed.

Meanwhile, FAP contacted the defendant, confused about why the public auction sales price was so much lower than the $9 million guarantee he had promised them.  The defendant told FAP to expect payment from Christie's in August 2019, but FAP, of course, never received payment. To date, Christie's has retained custody of the Stingel Picasso pending resolution of the disputed ownership claims.  (PSR ¶ 36).

      *6.  Donald Judd's "Untitled" (2018)*

The defendant defrauded two art investors in connection with an untitled 2018 artwork by Donald Judd ("the Judd").  In May 2015, the defendant purchased the Judd along with Louis Lannoo ("Lannoo"), an art collector and dealer based in Belgium.  Lannoo, through his corporate entity, purchased 50 percent of the artwork, and the defendant owned the other 50 percent, for a total value of $1.7 million.  The defendant was supposed to sell the artwork on Lannoo's behalf, and the artwork was stored at various locations in London, New York, and Switzerland purportedly for various viewings by potential purchasers.  The defendant told Lannoo the deals fell through. (PSR ¶ 38).

During this time, the defendant sold the Judd without Lannoo's knowledge.  In August 2016, the defendant sold the Judd to Artfin Ltd. ("Artfin"), an entity controlled by art collector Mark Scheinberg.  Artfin purchased a 75 percent interest in the Judd for $1.875 million.  Artfin did not purchase the Judd directly from the defendant, but from Andre Sakhai, the defendant's friend and frequent co-investor.  The defendant used Sakhai as an intermediary so that Artfin would not realize it was purchasing the artwork from the defendant, and the defendant paid Sakhai a commission for the sale.  The defendant did not disclose Lannoo's ownership interest to Artfin.  (PSR ¶ 39).

In early October 2019, the defendant requested that Artfin move the Judd to London for a viewing by a potential purchaser.  The defendant then arranged for Lannoo to show the artwork to a potential purchaser.  Lannoo did so believing that Lannoo was trying to sell an artwork that belonged to Lannoo.  Shortly thereafter, as described further below, the defendant disappeared.  Artfin retained custody of the artwork.  (PSR ¶ 40).

### 7.  *Yayoi Kusama's "Infinity Nets"*

In May 2019, Andre Sakhai purchased the artwork "Infinity Nets" by Yayoi Kusama for $850,000 from the Victoria Miro Gallery ("the Kusama").  Sakhai shipped the Kusama to an art storage facility in New York and subsequently learned there was some damage to the Kusama during shipping.  Sakhai sought the defendant's help to restore the Kusama, as the defendant had a good relationship with a conservator.  On July 8, 2019, Sakhai authorized the transfer of the Kusama to the defendant's storage facility for this purpose.  (PSR ¶ 42).

Days before its shipment to the defendant's storage facility, the defendant offered Dirk Cavens, an art investor based in Belgium, the Kusama and two other artworks on behalf of an unnamed client "who needs to raise some cash over the summer."  On July 10, 2019, Cavens' corporate entity Parfinim purchased the Kusama and a 2014 untitled Stingel painting for $3 million total.  The defendant transferred both artworks to Cavens' account at a New York art storage facility without informing Sakhai of the move or sale.  (PSR ¶ 43).

By October 2019, the defendant was having trouble perpetuating the Fraud Scheme.  The defendant admitted part of the fraud to Sakhai in early October 2019.  In response, Sakhai began taking stock of his artworks in connection with the defendant.  The defendant asked Cavens to release the Kusama from Cavens' storage so that the defendant could sell it for Cavens, and the defendant made multiple misrepresentations to Cavens that the defendant was attempting to close

12

a deal on Cavens' behalf.  This was false.  Instead, the defendant returned the Kusama to Sakhai's custody.  The defendant vanished later in October 2019.  Cavens was never compensated by the defendant for the Kusama.  (PSR ¶ 44).

**B.     The Defendant's Scheme Unravels and He Becomes a Fugitive**

By the fall of 2019, the defendant's Fraud Scheme began to come to light.  (PSR ¶ 45). By this time, various art deals—such as the attempt to auction the Stingel Picasso—had not gone well, and the defendant was no longer able to pay Athena or his investors.  (*Id.*).  In other words, the defendant's pseudo-Ponzi scheme collapsed.  Various investors became suspicious given the defendant's delay delivering payments and his increasingly eccentric explanations for the delayed payments, and investors began making increasing demands on the defendant to physically secure artworks, obtain documentation, and receive payment.  Faced with the collapsing Fraud Scheme, in early October 2019, the defendant made admissions to a few investors and Athena, disclosing portions of the Fraud Scheme, while keeping other investors in the dark.  (PSR ¶¶ 46, 47).  On October 14, 2019, Athena notified the defendant officially that he was in default of the Loan Contract.  (PSR ¶ 46).

On October 21, 2019, the defendant left the United States on a flight for Australia, and on October 23, 2019, the defendant arrived at the remote Pacific Island of Vanuatu, which does not have an extradition treaty with the United States.  (PSR ¶ 49).  The defendant abruptly abandoned his art business, shuttered his galleries in Miami and London, and ceased communicating with his investors and Athena.  (PSR ¶¶ 48, 49).  By November 2019, several victims had filed lawsuits in various jurisdictions.  The defendant had stopped responding to legal process, leaving his victims to resolve the competing ownership claims over artworks caused by his Fraud Scheme while he resided in Vanuatu with his fiancé.  (PSR ¶¶ 48, 49).

Although the defendant resided in Vanuatu in his own name, he maintained a low profile, cutting off communication with prior contacts and essentially maintaining no social media presence.

The FBI ultimately located the defendant in Vanuatu and obtained a complaint charging him with wire fraud and aggravated identity theft, in violation of 18 U.S.C. §§ 1343, 1028A. (PSR ¶ 49).  On June 12, 2020, the defendant was taken into the custody of the U.S. Marshals with the assistance of authorities in Vanuatu, and he has remained in custody since that time.  On July 13, 2020, a grand jury in the Southern District of New York returned an indictment charging the defendant with wire fraud and aggravated identity theft.

### C.    The Defendant's Attempted Cooperation with the Government

The defendant has been incarcerated since his arrest in Vanuatu in June 2020.  After his arrest, the defendant expressed interest in trying to cooperate with the Government.  Between October 2020 and November 2020, the defendant proffered with the Government on five occasions.[3]  During the lengthy meetings, the defendant admitted and discussed in detail his commission of the Fraud Scheme.[4]  The defendant also discussed bad acts and questionable conduct by others in the art market about which he had personal knowledge or second-hand information.  The defendant provided the Government with a copy of his computer hard drive and gave consent to search both the hard drive and his iCloud account. (PSR p. 29).

The Government assesses that the defendant was generally truthful and forthcoming with the Government during the proffers.  The Government was able to corroborate most of what the

---

[3] The PSR stated Philbrick participated in six proffer sessions.  (PSR p. 29).  This is in correct. Philbrick participated in five proffer sessions.

[4] The factual summary of the defendant's conduct set forth in this sentencing submission is based on evidence independently obtained by the Government through search warrants, subpoenas, and interviews of witnesses and victims.  The Government did not rely on the defendant's admissions during proffers to compile the factual summary here, although the content of the defendant's admissions during proffers was largely consistent with the Government's evidence.

defendant said about the Fraud Scheme through the evidence previously gathered, and also through the content of the defendant's computer.  In some instances, the Government was also able to corroborate what the defendant said about other actors in the art market.

Ultimately, the Government was unable to use the information the defendant provided to bring new charges against other individuals or entities or open new investigations, because (a) the information was uncorroborated; (b) the conduct described did not amount to a chargeable offense; and/or (c) the conduct was outside the jurisdiction of the United States.  The Government declined to extend a cooperation agreement to the defendant upon determining that the defendant would be unable to provide substantial assistance to the Government.

On November 18, 2021, the defendant entered a guilty plea to Count One of the Indictment.  After his guilty plea, the defendant provided information to the Government in response to a victim's questions about the whereabouts of an artwork.  The information allowed the Government to piece together information about the artwork and inform the victim that the artwork at issue was already awarded to another victim in a civil suit.

**D.     The Guidelines Calculation and Probation's Recommendation**

The Probation Office calculates the defendant's advisory Guidelines range, as follows, consistent with the stipulated Guidelines range in the plea agreement:

- In this case, involving a violation of 18 U.S.C. § 1343, the offense is governed by U.S.S.G. § 2B1.1.  (PSR ¶ 54).

- Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level for the offense is 7, because the statutory maximum term of imprisonment is 20 years or more.  (*Id.*)

- Pursuant to U.S.S.G. § 2B1.1(b)(1)(M), because the offense involved a loss that exceeded $65,000,000, but did not exceed $150,000,000, the base offense level is increased by 24 levels.  (PSR ¶ 55).

- Pursuant to U.S.S.G. § 2B1.1(b)(2)(A)(i), because the offense involved 10 or more victims, the offense level is increased by 2 levels.  (PSR ¶ 56).

15

- Pursuant to U.S.S.G. § 2B1.1(b)(1), because the defendant committed a substantial portion of the scheme from outside the United States, and the offense otherwise involved sophisticated means, the offense level is increase by 2 levels.  (PSR ¶ 57).

- Pursuant to U.S.S.G. § 3E1.1(a), the offense level is decreased by two levels, because the defendant demonstrated acceptance of responsibility for the offense.  (PSR ¶ 63).

- Pursuant to U.S.S.G. § 3E1.1(b), the offense level is decreased by one additional level, because the defendant timely notified authorities of the intention to enter a plea of guilty. (PSR ¶ 64).

In accordance with the above, the total offense level is 32.  (PSR ¶ 65).  The defendant has no known prior convictions, so his Criminal History Category is I.  (PSR ¶ 68).  Based upon these calculations, the defendant's advisory Guidelines range is 121-151 months' imprisonment. (PSR ¶ 116).

Taking into account all of the factors set forth in 18 U.S.C. § 3553(a), including the defendant's proffers with the Government, the Probation Office recommends a sentence of 121 months' imprisonment, the bottom of the Guidelines range.  (PSR pp. 28-30).

### E.        Forfeiture and Restitution

The Court must order forfeiture and restitution.  In connection with the defendant's plea, the Court has already entered a consent preliminary order of forfeiture in the amount of $86,672,790 million, representing the payments the defendant received from the Fraud Scheme. The Court should include forfeiture in this amount as part of the judgment at sentencing.  In addition, the Court should order forfeiture as to the two artworks listed in the consent preliminary order of forfeiture.

As part of the plea agreement, the defendant agreed to pay restitution in an amount ordered by the Court.  The Government intends to seek restitution as required under the Mandatory Victims Restitution Act.  So far, 16 victims have submitted claims for restitution. The Government has for months been evaluating the evidence and assessing information and

claims submitted by victims to ascertain a final restitution amount.  Restitution in this case is complex, involving Byzantine transactions, numerous artworks (many of which bear the same title, date, and artist), and multiple victims with competing claims to those artworks.  Owing to the extent of the fraud and the complexity of the issues involved, the Government requested the full statutory period of 90 days post sentencing to submit a final restitution request pursuant to 18 U.S.C. § 3663(d)(5), and the Court has granted the Government until July 5, 2022, to finalize restitution.

As indicated in the PSR, consistent with the Government's investigation to date, the defendant does not at present appear to have assets sufficient to pay forfeiture or restitution.  The defendant has left it up to his victims to fight amongst themselves to unravel his fraudulent art deals and recover their losses.  Many civil lawsuits filed by victims in various jurisdictions are pending to resolve disputed ownership claims over multiple artworks.  The Government expects that many victims, unfortunately, will never be made whole.

<u>**DISCUSSION**</u>

### I.      **A Substantial Term of Imprisonment Is Warranted**

The factors set forth in 18 U.S.C. § 3553(a) weigh strongly in favor of a term of imprisonment substantially beyond the nearly two years the defendant has served so far.

*1.    The Nature and Seriousness of the Offense and the Need for Just Punishment Call for a Significant Prison Term*

The nature and seriousness of the offense, and the need for the sentence imposed to provide just punishment, warrant a significant sentence.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).  As outlined at some length above, the defendant's fraud was both extensive and brazen.  During a four-year period, the defendant scammed at least 23 victims, ranging from individual art collectors with less experience in the art market to well-established gallerists, investors, and

lenders.  The defendant manipulated his victims by first engaging in successful art deals with victims to gain their trust, and then abusing that trust to get their money via fraudulent art deals. The defendant exploited those close to him, defrauding friends, the godfather of his first child, and his former mentor.[5]  He also defrauded a number of victims multiple times in connection with multiple works of art.  The defendant deployed his charm and deep knowledge of the art market to induce his victims to purchase stakes in artworks and lend him money, and he took advantage of the confidentiality of the art market and his physical possession of artworks entrusted to his care by clients to conceal the Fraud Scheme.  To persuade his victims to invest in artworks or loan him money, the defendant at times provided victims with fake invoices and contracts to corroborate his misrepresentations regarding the ownership and purchase history of the artworks; on at least two occasions, those fake documents included the forged signatures of innocent third parties.  The audacity of the defendant's fraud is epitomized by the defendant's invention of "Martin Herrero"—an entirely fictional person (with an entirely fictional email address) invented only to avoid paying his erstwhile mentor Jay Jopling.

The defendant's fraud was extensive with respect to the number of victims, the number of artworks, the length of time—and the loss amount.  Losses from the Fraud Scheme topped $86 million.  The complex nature of many of the defendants' transactions made it difficult for the Government and victims to uncover the extent of his crime.  Victims have been left to try to

---

[5] The defendant's sentencing submission includes a letter from Ferdinand Gros, who operates an art gallery and who described what he perceived as the defendant's good character.  (Def. Mem., Ex. G).  Gros writes the defendant avoided engaging in business with Gros, which Gros later understood to be the defendant's efforts to "protect" Gros.  Email evidence, however, shows that in November 2017, the defendant tried to sell Gros an untitled 1976 artwork by Donald Judd that the defendant had already sold to FAP in February 2017 and pledged as collateral to Athena in August 2017.  Ultimately, there was no sale because Gros' client was not prepared to move forward at that time.  The 1976 Judd artwork is one of the 29 artworks included in the offense conduct.  The defendant's attempt to sell the 1976 Judd to Gros further demonstrates the pervasiveness of the defendant's fraud.

untangle the mess through civil litigation over artworks with competing claims, and in the

process have had to spend even more money on legal fees.  Much of this litigation involves

victims having to fight against one another to make up their losses.  This constitutes an

additional layer of harm that the Court should be cognizant of in imposing sentence.  And while

the Government is seeking forfeiture and restitution, the defendant appears to have dissipated

almost all the proceeds of his crime, so that many victims will never be made whole.  The

extensive and irreparable damage the defendant caused calls for a significant term of

imprisonment.

One poignant example of the harm the defendant caused is set forth in the Victim Impact

Statement of Daniel Tümpel, the owner of FAP, attached hereto as Exhibit A.  Tümpel describes

the defendant's dishonest efforts to earn Tümpel's trust by initially engaging in several

successful deals and developing a personal, friendly relationship with Tümpel, including visiting

Tümpel's family.  The defendant subsequently abused that trust by defrauding FAP in

connection with multiple artworks, feeding Tümpel a series of lies and fake documents masked

by charm and the defendant's expertise in the art market.  This is a common story among the

defendant's victims.  Tümpel describes the defendant's deceit:

> Philbrick very much knew what he did to my family and to me. He had been to our
> family house many times and he even knew our four children by name –and yet he did
> not care. He knew how enormous the financial damage would be for us – and yet he did
> not care. All his friendliness and care about our family was a show he put up in order to
> get into a position to steal even more from us.

The defendant's fraud has "led to an immense financial loss" for Tümpel and his family, and the

fraud has turned "the last two and a half years into the most horrendous and difficult years of

[their] lives."  Tümpel explains that the money the defendant stole was "money [Tümpel and his

wife] had worked hard for . . . and which Philbrick embezzled to finance [a] luxurious

lifestyle . . . ."  Like other victims, Tümpel's loss "increased by the substantial costs for lawyers [they] had to pay trying to help recover [their] artworks."  As Tümpel states, "[he is] still suffering from the consequences of Philbrick's actions every day.  This episode was the worst nightmare of [his] life."  The sentence imposed must be sufficient to account for this significant harm, and the similar losses and betrayal suffered by others because of the defendant's fraud.

In his sentencing submission, the defendant argues that the $86.43 million loss overstates the actual harm to the victims because the victims largely can recoup their losses by recovering the physical artworks.  (Def. Mem. p. 3-5).  Although the Government anticipates that the final restitution amount may be lower than $86.43 million, it will unlikely be meaningfully lower.  Although there are valuable artworks that victims can recover, they may only be able to do so after years of expensive civil litigation to resolve disputed ownership claims.  Even if a victim has physical custody of an artwork, the clouded title of the artwork due to the defendant's fraud decreases the value of the work.  In other instances, artworks have yet to be located.  Ultimately, the victims cannot be made whole for the very reason the fraud ultimately collapsed—there are more claims to each of the artworks than the value of the artworks can necessarily sustain.  Additionally, victims are entitled to recover as part of restitution certain attorney's fees and interest not included in the Guidelines loss calculation.  The $86.43 million is therefore an appropriate indicator of the scope of the fraud.

2.  *The Defendant's Disdain for Victims and Lack of Remorse Warrant a Significant Term of Imprisonment*

The history and characteristics of the defendant, and the need for the sentence imposed to promote respect for the law and provide specific deterrence, warrant a substantial sentence.  *See* 18 U.S.C. §§ 3553(a)(1), (2)(A).  The defendant's repeated decisions to lie to his clients, investors, and even his purported friends and mentors were not simply the actions of a young

man who had gotten in over his head or who had been somehow corrupted by an avaricious industry.  The evidence reflects that the Fraud Scheme was the product of advance and ongoing planning and shows that the defendant felt disdain for some of the clients he was defrauding.  For example, the defendant and Newland used subtly derogatory nicknames to refer to certain of their victims.  They kept spreadsheets tracking which victims owned what percentages of artworks—in many cases tallying to more than 100 percent ownership or more than the estimated value of the artwork—and various misrepresentations made to victims.  A handwritten note recovered from the defendant's Miami gallery discussed one of the defendant's repeat victims, and posed the question, "How to fuck them?"  The con went beyond mere misrepresentations about ownership of artworks, to include the drafting of fake contacts, forged signatures, and the invention of an entirely fictitious person.  In short, the defendant's actions during the Fraud Scheme demonstrate a lack of remorse, hesitation, or concern about the impact of his action on others, suggesting the need for a sentence that promotes respect for the law and specific deterrence.

Nor are the defendant's actions excused or explained by particular hardships in his background. To the contrary, he appears to have had a relatively privileged upbringing and to have begun his career with enormous opportunity given his early success at a well-known gallery.

Even when the defendant's scheme began to fall apart, he did not immediately accept responsibility for his actions.  Rather than face the consequences of his conduct, he used his access to wealth to flee from creditors and investors to a remote Pacific island halfway around the world shortly before news of the fraud broke.  The defendant continued to hide in Vanuatu after new articles reported the Government's investigation in Spring 2020.  At no point in the

nine months between when he left the United States and his arrest did he reach out to victims to try to sort out the tangle of issues he left behind.  In a post-arrest interview, the defendant told the FBI that he knew Vanuatu had no extradition treaty with the United States, and he stated he was aware of media reporting regarding his fraud.

Once the defendant was sitting in a prison cell, he sought to cooperate with the Government.  The Government recognizes that the defendant made significant and sincere efforts to help the Government; the sentence imposed should reflect those efforts and the fulsome acceptance of responsibility entailed in those meetings.  In recognition of his attempted cooperation, the Government extended a plea offer to the defendant that did not include the aggravated identity theft charge, which carries a mandatory consecutive two-year sentence.  And in further recognition of these efforts, the Government now seeks a sentence below the Guidelines range of 121 to 151 months' imprisonment.

But the mitigating factors must be weighed against the substantial aggravating factors in this case, including: the fraud's lengthy duration, the multitude of artworks, the enormous loss amount, the complexity of the fraud, the numerous victims and the serious harm they have suffered, the defendant's use of fraudulent documents and stolen identities, the defendant's manipulation of his victims, and the defendant's flight to Vanuatu.  These aggravating factors warrant a substantial sentence significantly above the twenty-two months the defendant has served to date.   Moreover, even if the conditions of confinement at the MDC as described by the defendant are true, they do not merit a lenient sentence given these aggravating factors.

3. *The Sentence Imposed Should Reflect the Need for General Deterrence of Fraud in the Art Market*

Finally, the need for general deterrence and the need to avoid unwarranted sentencing disparities weigh in favor of a substantial sentence.  *See* 18 U.S.C. § 3553(a)(2)(B), (a)(6).  A

substantial term of imprisonment is necessary to provide general deterrence and dissuade others—particularly those who transact in the art market with its extremely valuable assets and notable lack of oversight or regulation—from engaging in this type of crime.  Conditions in the art market are ripe for abuse by fraudsters like the defendant.  Buyers and sellers regularly transact through brokers for a number of reasons, including to maintain anonymity of the buyers and sellers and because of the expertise necessary to evaluate and handle the artworks.  Thus, the art market traditionally operates on relationships and trust to maintain the confidentiality of the buyers and sellers and the price of artworks.  In recent years, there has been an increasing trend to commoditize the art market.  Buyers and sellers treat valuable art works as an alternative asset class to diversify their investment portfolios and purchase percentage ownership stakes in an artwork with the intention of reselling the artwork for a profit within a short period of time.  Moreover, artworks are increasingly used as collateral to finance loans for the purchase of other artworks.  This combination of conditions—secrecy, valuable assets, lack of regulation, and the commoditization of art—creates opportunities for fraud schemes such as the defendant's scheme.  A significant custodial sentence is necessary to send a corrective message and restore some measure of faith in the proper functioning of this valuable, but unregulated market.

The defendant argues in favor of a lenient sentence on the basis that two recent art fraud cases in this district, *United States v. Rosales*, 13 Cr. 518 (KPF), and *United States v. Chowaiki*, 18 Cr. 323 (JSR), resulted in lenient sentences.  These comparisons are misplaced.  In *Rosales*, Glafira Rosales worked with others to sell more than 60 forged artworks to galleries over 15 years for more than $30 million, and Rosales engaged in tax fraud to hide the scheme's proceeds.  (Gov't 5K1.1 Letter, Dkt. No. 57).  Rosales' Guidelines range was 151 to 188 months' imprisonment.  Judge Failla sentenced Rosales to three years of probation given a myriad of

mitigating factors that are not present in this case.  For example, Rosales' prompt cooperation enabled the Government to obtain search warrants and multiple indictments charging Rosales' co-conspirators (although they were never successfully extradited); Rosales' information "was absolutely instrumental in building the case against her co-defendants," earning her a 5K1.1 letter.  (*Id.* at 5).  Rosales' information also facilitated the resolutions of many civil lawsuits resulting from the fraud.  (*Id.* at 6).  Rosales was not the lead instigator of the scheme; the architect of the scheme was the defendant's husband and father of her child who had a long, physically and emotionally abusive relationship with Rosales.  (3/1/2017 Tr., Dkt. No. 61, at 8-9, 34-41).  Rosales, moreover, forfeited all her personal property, including her house and bank accounts.  (*Id.* at 45).  Comparable mitigating factors do not exist in the defendant's case, and *Rosales* is thus not instructive here.

In *Chowaiki*, Ezra Chowaiki, who operated an art gallery, over a two-year period fraudulently sold artworks on consignment with him, keeping the profits for himself, or pledged them as collateral to satisfy his debts, with a total loss of approximately $16 million.  (Gov't Sentencing Submission, Dkt. No. 73).  Chowaiki's Guidelines range was 51-63 months' imprisonment.  Judge Rakoff sentenced Chowaiki to 18 months' imprisonment in consideration of various mitigating factors, including Chowaiki's quick and fulsome acceptance of responsibility.  Chowaiki's case is distinguishable.  Compared with the defendant's fraud, Chowaiki's fraud lasted half as long and involved a much smaller loss amount.  Chowaiki's fraud involved neither forged documents nor stolen identities nor bold-faced lies.  Unlike the defendant, Chowaiki had for years operated a legitimate gallery but began the fraud to support the failing gallery after it was forced to into an expensive civil settlement.  (Def. Sentencing Letter, Dkt. No. 71, at 7-8).  Choiwaiki received numerous letters of support from other art

dealers, including two victims, given his many years of reputable conduct.  (*Id.* at 23-30).  The same cannot be said of the defendant, who began his fraud at the inception of his art business.  In sum, *Chowaiki* is not a meaningful comparison.

While no comparison will ever be perfect, defendants in other art fraud cases in this District have received substantial sentences for less extensive fraud.  In *United States v. Spoutz*, 16 Cr. 392 (LAK), Judge Kaplan sentenced convicted art fraudster Eric Spoutz to 41 months' imprisonment for selling dozens of fake artworks over a decade and thereby defrauding art collectors of nearly $1.5 million.  In *United States v. John Re*, 14 Cr. 550 (PKC), Judge Castel sentenced convicted art fraudster John Re to 60 months in prison for selling fake artworks totaling a little over $2 million over many years.  Though these cases involved fraudulent works of art, and occurred over a longer period of time, it shows the seriousness with which such crimes have been met in this District and it shows that additional serious sentences are necessary to combat fraud and dishonesty in the art market.

## **CONCLUSION**

For the reasons set forth above, the Government respectfully recommends that the Court impose a below-Guidelines but significant term of imprisonment, a sentence that is sufficient but not greater than necessary to serve the purposes of sentencing.

Dated:  New York, New York
        April 4, 2022

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney

By: _____/s/_____
    Jessica Feinstein
    Cecilia E. Vogel
    Assistant United States Attorneys
    (212) 637-1946/1084